Your Honor, I may please the Court. Michael Pandulo for the Appellant Raymond Garcia. Your Honor, this is Raymond Garcia's appeal of two counts, one for conspiracy to distribute a controlled substance and the other for possession of a controlled substance with intent to distribute. Mr. Garcia was convicted after a jury trial and sentenced to 293 months in federal prison. There are three issues on appeal that we present. The third is based on the sufficiency of the evidence to support the jury verdict. I'd submit that on the briefs and not argue that further. There are two remaining issues or two suppression issues. One, a Fourth Amendment issue based on the traffic stop that was performed in this case, and a second suppression issue based on the alleged custodial interrogation of the defendant and the statements that were elicited from him pursuant to that custodial interrogation. If I could just sort of cut right to what I think are the main issues here. The first issue is whether or not, and I'll give a little factual background. There was a long investigation, Las Vegas Metropolitan Police Department and DEA task force were investigating a drug ring. There was information that this drug ring was low on its supply. And as a result, the appellant, Raymond Garcia, was followed. There was surveillance in place. At some point, Raymond Garcia is, he had driven this red Lincoln town car and it, which had broken down. And there was, this town car then makes its way to, on a tow dolly. And Mr. Garcia is the passenger in the and the wall stopped. The purpose of this is to, well, make your own probable cause, effectuate a stop, but find your own probable cause or make your own probable cause. And then get this, in order to get the drugs. Now, is that really accurate to say he was requested to make a justification or was he followed to see if there was a violation? Your Honor, I think if you review the record, I think that's, I do think that that's a fair statement of the facts. That he was told to make his own probable cause and effectuate the arrest. Now, the issue is, does that even matter? The government has cited Ren v. U.S., which is the Supreme Court case, and U.S. v. Ibar, the Ninth Circuit case, which says essentially that the subjective intent of the officer doesn't really matter, as long as they have objective reasons for effectuating that stop. Well, who cares if it's, if it's pretextual? And that's true, except there is an exception. Well, if there are objective reasons, then it's not pretextual, is it? Well, correct me if I'm wrong, but pretextual refers to the reasons why this stop was minor traffic infractions. But the real reason is, well, we think this car has a load of methamphetamine on it. Then that would be a pretextual reason, regardless of whether or not, regardless of whether or not there were other objective reasons. But it's a separate question whether that even matters. So what? Right, exactly. Which brings me to the point of, there is an exception for a search and seizure conducted in an extraordinary manner. And, and here I would just point to the facts that this was, the stop lasted, and, and, and these facts that I'm referring to, if, if I could refer you to the report and recommendation done in the United States District Court, District of Nevada, has all these, these factual findings that I'm, that I'm going to be referring to, was that this search, the, the, the entirety of it was, excuse me, was finally arrested. And, and, and consider that he was the, there, there are these minor traffic infractions that are cited. For instance, that there, there weren't proper lights on, on the vehicle, which was being towed. Consider that Mr. Garcia was a passenger in a, in a tow truck, and the vehicle that was stopped was, was his vehicle, but he wasn't driving it. Tow truck driver was driving. So I would invite you to, to consider whether or not that would constitute an extraordinary manner in which that pretextual stop was effectuated. Because if it is done in an extraordinary manner, then it is, then it is, is relevant to whether or not there was reasonable suspicion at the time, at the time of the stop. The second issue. I realize sometimes some of these issues kind of weave together. Yes. But I'm not sure I understand what you're talking about either. It seems to me either there was, there was grounds or there weren't. And when you start talking about what happened later, I'm not sure how that speaks to the question of whether there were grounds for the stop itself. And one of the problems I've had with this case generally, and so the government should pay stop. Was there a point along the way? I mean, you make emphasis of that. And so I want you to focus on, okay, at what point along the way did something cross the line? I mean, I think it would be reasonable to conclude that at least based on the factual findings of the district court, unless we're to find those factual findings clearly erroneous. At the initial stop, there was a justification offered for it. The whole thing winds up taking like five hours. And it sounds to me like your principal challenge is at some point it crossed the line. And if that is where you're coming from, I'd like you to get a hone in on what it was that you think crosses the line and why at that point. Sure. Now the district court's determination was that at about 55 minutes into the stop, there was probable cause for an arrest, an arrest on presumably the drug charges. And our position is that there was not probable cause at that time, but that after there was this questioning done regarding these minor traffic infractions, I mean, the officer did find that the vehicle was registered to Raymond Garcia. And he found a number of things in his favor. And he cites reasons for why his suspicion was furthered and why this investigation had to expand its scope, that there were certain inconsistencies between the statements of Garcia and his traveling companions, which I think if you look at them, whether they were really inconsistencies, however, at this point, we're sort of have to defer to the district court a bit on that. But was there probable cause as far as the drug offenses? Just because there were some alleged traffic infractions, and then on top of that, there were... Along the way, there was a consent to search. So maybe the time between the stop and the consent to search would be important, wouldn't it? Yes, yes. And we believe at that time, when the consent to search was requested, that it would have been at that time, the search had expanded unreasonably at that point. But you have consent to search. At that point, yes. How can you expand it unreasonably if you have consent to search? At that point, but I guess the question is whether or not that would remove the taint of the earlier wrongdoing. But the consent to search came after about 55 minutes, didn't it? Yes, yes. And I mean, 55 minutes, it's getting along in time, but there are a number of cases that say that that's not too long. Right. And at that point, then you get a consent to search. You do. And what happened was they bring a canine unit out, the dog doesn't alert, and then you have the officer. And because, I mean, keep in mind, he's been told, hey, this car has drugs in it, okay? So you find a way to pull these guys over, find a way to get those drugs. So realistically, I mean, he brings up the... He's citing these inconsistencies, but did he really find any inconsistencies? I mean, he asks any two people to give you one version. Why does he have to find inconsistencies once he gets consent to search? Well, this was before. This is before. All right. But then we have to deal with about 55 minutes. Yes. And after that consent to search, you have a canine unit come out, you have the dog fails to alert, you know, and the officer is then, as we see it, manufacturing reasons to continue the search beyond what would be reasonable based on these traffic infractions, based on these alleged inconsistencies in... It was not a limited consent to search, was it? Until they got to the gas tank and they said, can we search the gas tank? And Garcia said no. Right. It was limited in the sense they said search in the car. He didn't say search under the car or in the gas tank. Well, there's no question, but the officer could look under the car. He could have done that right from the get-go. He didn't until late. And once he did, it appears that he probably found enough to justify going on from there. So I'm faced with the question of, okay, prior to the consent to search, did something happen that somehow vitiated the consent, that made that consent involuntary? What is it? Well, yeah, absolutely. At that point, there was no way that Mr. Garcia thought that he was going to be allowed to leave at that point. He has a number of officers on the scene. I would say the conduct of the officers, and you can see from the record, indicated to Mr. Garcia that he didn't really have a choice in whether or not he was allowed to consent. And I believe the officer indeed admitted that if Mr. Garcia had asked, could he leave at that point, would he be allowed to leave? And the answer is, of course, no. How does that relate to the search? Who leaves? The car sits there. Just as it's relevant to whether Mr. Garcia had understood that he had any choice in the matter of consent to search, just in that matter. I would bring up, I'm running out of time, and I wanted to leave some time for rebuttal, but the second issue as to the interrogation, this interrogation was, well, I mean, they say it's spontaneous. Of course, they're saying it's spontaneous, where Mr. Garcia says something along the lines of, it wasn't worth $600. Keep in mind, he's being transported by an officer who had been investigating this matter, and he's an interrogation at that point. They, of course, say no, but was it the functional equivalent of an interrogation pursuant to U.S. v. Moreno? And we would submit that yes, it was. Additionally, U.S. v. Cazares, which is cited in the appellee's answer in brief, the voluntariness of the waiver, because indeed, they do say that Mr. Garcia was given his Moreno rights and he waived them, so now this was a day later, or not a whole day, but it was sometime later. What was the interrogation? Well, and this is the thing. There was no interrogation per se. We're saying that it would be essentially the functional equivalent of interrogation. He was, and we want to say that pursuant to U.S. v. Cazares, there was overreaching in the sense that you have this situation that's set up where an investigating officer is sent to take this guy one-on-one, and once he starts making statements that could be incriminating, the officer says, wait, what did you say? I want to hear what you said, and encourages him to make these incriminating statements. And I think I have a question. The interrogation part is when he asks him to repeat what he said? Yes, or the functional equivalent of an interrogation, because he's going to be eliciting incriminating, I mean, he knows at that point. He's going to be getting incriminating statements. Why does he know that? Well, because he really heard him the first time. He just wants, well, he's not sure what he heard, so he wants to make sure that he can hear what he says. If he heard him, he didn't need him to repeat it. Well, I mean, that's one way to look at it, Your Honor, but I think the other way to look at it is that he heard what he said, he knew that he was saying something incriminating, and that he encouraged him to say it. And I have about a minute left, and I'll reserve that for rebuttal. Thank you. Good morning, Your Honor. Peter Levitt for the Appley United States of America. I'd like, right off the bat, to clarify a factual issue pertaining to the chronology of this case. Detective Bunn, who is getting the wiretap intercepted information and the information from Detective Murray on surveillance of the defendant keeping an eye on the methamphetamine-filled car, he called Officer Robert Johnson shortly before 7.40 p.m. Officer Johnson then performed a vehicle stop at 7.40 p.m. At 8.45 p.m., 55 minutes later, that's when the defendant was in custody. And there has been a factual finding, supplemental excerpts of the record, page 20. The magistrate said because Garcia was not free to leave, well, rather the court finds because the detention lasted as long as it did and because Garcia was not free to leave at approximately 8.45 p.m. or shortly thereafter, Garcia was in custody, and the investigative detention had ripened into a full-scale arrest. So I'd respectfully submit, Your Honor, that what we're talking about here is a 55-minute detention where, unlike virtually every other reported decision, these law enforcement officers knew from a court-authorized wiretap that this vehicle was strongly implicated as bringing a load of bulk methamphetamine to the Lopez Brothers drug-trafficking organization in Las Vegas, Nevada. There's no question of staleness. They were listening to this flurry of increasingly frantic calls back and forth between Giovanni Lopez's telephone and the defendant's co-conspirators all afternoon. So given that was the basis for the stop, they knew that this red car that the co-conspirators repeatedly referred to were bringing methamphetamine to Cruz Giovanni and the person on his end, Jose, who is helping get the car towed to safety. They wanted their drugs. That was the basis for the stop. That's what furnished the reasonable suspicion that criminal activity was afoot. The ---- But we don't need the taillight stuff at all. That's quite right, Your Honor, because ---- Who's going to stop them without that? Your Honor, I believe that based on the contents of the wiretap pointing squarely to the red vehicle as the drug-laden vehicle, coupled with Officer Johnson shortly after 740 determining that Garcia was the owner of the red vehicle, there was probable cause to arrest him for possession with intent to distribute right there. We don't have ---- Was there anything more specific than a red vehicle? No, Your Honor. So you can arrest anybody who's driving toward Vegas in a red vehicle? Not if you have the drug traffickers talking about the car first breaking down at prim, then they say we've broken down again at the Texaco Station near Mandalay Bay, then the monitoring agents dispatch a surveillance team to look at that, overlook that Texaco Station near Mandalay Bay Casino, and they see the defendant and Quintero and Beltran walking around it. They knew which red vehicle it was. So the answer to Your Honor's question is no, and I'd back up a second here and, consistent with what Judge Hug correctly suggested, point out that we don't need to reach the issue of whether there was probable cause to arrest at 740. All we need to do is determine whether there was reasonable suspicion that there plainly was based on the wiretap and pretextually based on the four separate violations of Nevada State traffic law. I would next note, Your Honor, that just to make plain, we're clear on the record, I believe, and I apologize if I misheard, that Judge Roth indicated that consent was given 55 minutes after the stop. That is not the fact in the record. Rather, what had happened was between 845, pardon me, 750 and 845, the defendant had told Officer Johnson, Garcia said Johnson could search anywhere he wanted. That's a supplemental excerpt of the record, page 11. Officer Johnson then did conduct the canine search and look in the trunk and see suspicion arousing fact after suspicion arousing fact, including the inconsistencies between defendant's story, said he was visiting a relative, and the tow truck driver's story, said I was taking defendant to a casino. And he noticed in the trunk that defendant had no personal belongings at all for his trip from the Republic of Mexico to Las Vegas, Nevada, but did have an extra can of gasoline. And remember, Officer Robert Johnson is a certified mechanic. He'd also performed approximately 3,500 traffic stops by this point. So he moved rapidly, he moved briskly, and he expanded his inquiry in response to each suspicion arousing factor that manifested itself during his investigation. It was only after Officer Johnson, the certified mechanic, got underneath this really driven and older model vehicle and saw shiny new bolts and retention straps and evidence of repeated dropping of the gas tank that Officer Johnson reached out and tapped on it. And instead of hearing a sound consistent with a telltale dull thud that told him something else was in there. In other words, Your Honor, at that point, when Officer Johnson said, could I look inside the tank, defendant, whose demeanor had been very calm and relaxed in the beginning, grew very suspicious and increasingly nervous and said, no, you cannot. 845 is the point at which the consent was withdrawn. Officer Johnson dutifully stopped. Defendant was, as is factually found, in custody at that point. And Detective Bunn, in any event, arrives 15 minutes later, or at approximately 9 o'clock, and at that point formally arrests him and gives him his Miranda rights and warnings. I would note, Your Honor, that the defendant's initial consent to search in the trunk of the vehicle, it's arguable whether he needed consent to look around the vehicle and run a canine around the exterior, but that was freely given. The defendant said at first you could look in it. Officer Johnson explained, no, I don't want to simply look in it, I want to search your car. And he said, I'm going to use a dog. And at that point, as found in supplemental excerpts of the record at that point, he was able to do whatever he wanted. The point of the 55-minute detention is that Officer Johnson did exactly what the Supreme Court urged in Sharp. He moved quickly. He moved diligently either to confirm or dispel his suspicion. And the suspicion we're talking about here is the suspicion that arose not from the comparatively minor traffic violations, but rather the suspicion that arose from the wiretap. The wiretap indicated there were drugs in the vehicle. His brisk and diligent investigation confirmed rather than dispelled that suspicion. He couldn't have worked any faster with five suspects on the site and two vehicles to search. And as this Court correctly held or noted in U.S. v. Turvin, officers are not required to move at top speed. They're required to move diligently. And Officer Johnson did. There was 55 minutes before there was the consent search, right? Before the defendant denied consent. At 840, the stop was at 750, and at 845, Officer Johnson got out from under the car and said, could I look in your gas tank? And the defendant said no. Okay. How much time elapsed between the stop and the consent to search? That is not clear from the record, Your Honor. The stop was at 740. Officer Johnson's phase of the investigation ended at 850, 845, pardon me. We know that if the stop occurred at 740, Officer Johnson determined that defendant was the owner of the vehicle in question. He asked the defendant about where he was going and his travel plans. He asked Mr. Ortega, the driver of the tow truck, where he was taking defendant. So after those matters transpired, Officer Johnson then asked the defendant, and for that matter, Mr. Ortega, for consent to search their respective vehicles. I'm trying to find out is how much time from the stop until the consent search. I could guess, Your Honor, but it must have been some time shy of 55 minutes. There's no specific factual finding in the record as to whether defendant supplied that specific consent. But it was something shorter than 55 minutes. Yeah. Actually, it looks like it was the timeline within the magistrate's report puts the arrival and then the dog search at 820. The stop was 750, so we're looking at something less than 30 minutes, because the consent took place before the dog search. That sounds about correct. And after the dog search, and that search was negative, as counsel correctly pointed out, the other suspicion-arousing facts continued to be discovered by the Officer Johnson. Turning finally, Your Honor, to defendant's argument regarding the fact that the defendant was transporting the statements that he made the following morning to Detective Scott Thomas. Detective Scott Thomas was merely transporting the defendant from city jail to the federal court for his initial arraignment. And it was the defendant who initiated virtually the entire ensuing conversation. The defendant asked where they were going. The defendant asked what the charges were. Defendant Thomas answered, possession with intent to distribute methamphetamine. It was the defendant who said, what is methamphetamine? Defendant Officer Thomas said, vidrio, velocidad, using slang words. They literally mean glass and speed, but common slang words for methamphetamine. And at that point, the defendant volunteered, no, no, no, I thought I had mota, a slang word for marijuana. After a further exchange, the defendant volunteered that, well, he asked what was the maximum sentence. He volunteered that he was only supposed to get $600 for this, and he lamented that $600 wasn't worth it. At that point, as Judge Hug pointed out, Detective Thomas offered, made his only question. He said, I'm sorry, what did you say? And as the district court found, considering the context surrounding this question, the court finds that Officer Thomas could not have foreseen that merely asking the defendant to repeat himself would elicit an incriminating response. That's an excerpt of record appellant's tab 127 at page 2. I respectfully submit that that factual finding is not clearly erroneous and should be respected. The bottom line here is that Detective Thomas merely responded, even if he had interrogated the defendant, there had been prior to him asking, I'm sorry, what did you say? The defendant's admission to mota, which is really what the whole thing is about. And Officer Thomas did not engage in interrogation or its functional equivalent. Indeed, in Moreno's Flores, the statement, you're in serious trouble, which is far more functionally equivalent than anything that Officer Thomas said in this case, was deemed not calling for or requesting an incriminating response. The mere fact that it might strike a responsive cord is not enough. This is a tangent, but I was curious, so I'll go ahead and ask, is it a usual practice for somebody who's facing pretty serious drug charges to be driven from jail to the federal courthouse with a single officer in an ordinary car? I don't know the answer to that question, Your Honor. I mean, the factual findings don't seem challengeable, but I have to say, that struck me as an unusual circumstance. For what it's worth. Your Honor, I would also like to, I see I'm out of time, but add or correct very briefly a mistake in the answering brief. We cited the Turvin citing the child's opinion, and we cited child's, we cited it for the sake of the defendant's   The defendant's opinion is not a judgment of the Ninth Circuit. In fact, that is a Seventh Circuit case. It aspires to be a Ninth Circuit case. Thank you. Rebuttal? Yes, sir. Okay. As far as the length of the detention, I just want to read real quickly from the report and recommendation. Here it took the officers a total of five hours to confirm their suspicions. Now, we were talking, there was some discussion about whether the officers moved quickly. I believe that the finding was the opposite of that. Here I read again. This plainly went beyond the brief limit of a Terry stop. Significantly, the officers did not pursue a means of investigation likely to confirm or dispel their suspicions quickly. Moreover, given that officers had obtained a search warrant for the vehicle, it does not appear that Garcia's presence was essential to the officers' investigation. Also, I believe Mr. Levitt said that Judge Hunt's determination was that we don't reach the issue of probable cause for arrest because there was reasonable suspicion. My reading of the report and recommendation was the opposite, that in fact, the Court says, and this is, again, from the report and recommendation, it is therefore necessary for the Court to consider whether Johnson had probable cause to arrest Garcia, that being at the time of 845, and, of course, that would be pursuant to the totality of the circumstances, and we would submit that there was not probable cause to arrest at that time. Thank you. Thank you for the argument. Thank both counsel. The case just argued is submitted for decision.
judges: Hug, Clifton, Roth